Citation Nr: 1714114 
Decision Date: 04/28/17 Archive Date: 05/05/17

DOCKET NO. 10-29 487 ) DATE
 )
 )
On appeal from the
Department of Veterans Affairs Regional Office in Muskogee, Oklahoma


THE ISSUES

1. Entitlement to service connection for a disability manifested by fatigue, including chronic fatigue syndrome (CFS) and to include as due to an undiagnosed illness. 

2. Entitlement to service connection for bilateral hearing loss. 


REPRESENTATION

Appellant represented by: The American Legion


WITNESS AT HEARING ON APPEAL

Appellant


ATTORNEY FOR THE BOARD

J. Fussell, Counsel

INTRODUCTION

The Veteran served on active duty from June 1986 to October 1986 and from November 1990 to June 1991.

This case comes before the Board of Veterans' Appeals (Board) on appeal from an April 2009 rating decision of a Department of Veterans Affairs (VA) Regional Office (RO). 

A December 2012 Board decision granted service connection for fibromyalgia but remanded the claims addressed herein to afford the Veteran the opportunity to testify in support of his claims. 

An October 2013 rating decision effectuated the grant of service connection for fibromyalgia which was assigned an initial 40 percent disability rating. 

The Veteran testified at an October 2015 travel Board hearing before the undersigned Veterans Law Judge (VLJ) sitting at an RO and a transcript thereof is of record. 

In the December 2012 Board decision it was noted that the issue of entitlement to an increased rating for major depression was raised by the Veteran's representative in an October 2012 brief, and that matter was referred to the RO. Thereafter, a January 2016 rating decision granted an increased rating for major depression, with a history of dysthymic disorder (claimed as depression), including the symptom of sleep disturbance, from a 30 percent rating to 70 percent. No appeal has been taken from that decision. 

In 2012 the Board observed that in the April 2010 Informal Hearing Presentation the Veteran's service representative stated that CFS had been granted and included as a component of his service-connected major depressive disorder, which was subsequently increased to 70 percent effective November 17, 2015. However, in 2012 the Board disagreed inasmuch as there is otherwise nothing which corroborates this assertion. Rather, while a VA chronic fatigue syndrome Disability Benefits Questionnaire in November 2015 reflects diagnoses which included CFS, the increased rating was predicated upon a November 2015 VA psychiatric examiners best summary of the Veteran level of occupational and social impairment. 

In May 2016 the Board found that there was new and material evidence to reopen the claim for service connection for a disability manifested by fatigue, including CFS and to include as due to an undiagnosed illness. Prior to de novo adjudication that issue and the claim for service connection for bilateral hearing loss were remand to obtain VA medical nexus opinions. 

The case has not been returned for appellate consideration. 

This appeal was processed using the Veteran's Benefits Management System (VBMS) and, in addition there is a Virtual VA paperless claims electronic file. Accordingly, any future consideration of this appeal should take into consideration the existence of these electronic records.


FINDINGS OF FACT

1. The Veteran had active military service in the Southwest Asia Theater of operations. 

2. Fibromyalgia has been diagnosis and is service-connected and, as such, is not an undiagnosed illness, and the Veteran's current chronic fatigue, claimed as due to an undiagnosed illness, is medically documented to be a symptom of service-connected fibromyalgia and service-connected psychiatric disability, and a reported sleep disorder; and is not shown to be due to an undiagnosed illness or medically unexplained illness. 

3. The preponderance of the evidence demonstrates that the Veteran does not have a hearing loss in either ear by VA standards. 


CONCLUSIONS OF LAW

1. The criteria for service connection for a disability manifested by fatigue, including CFS and to include as due to an undiagnosed illness have not been met. 38 U.S.C.A. §§ 1110, 1117, 5107(b) (West 2002); 38 C.F.R. §§ 3.102, 3.303, 3.317 (2016). 

2. The criteria for service connection for bilateral hearing loss have not been met. 38 U.S.C.A. §§ 1110, 5107(b) (West 2002); 38 C.F.R. §§ 3.102, 3.303, 3.385 (2016). 


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Veterans Claims Assistance Act of 2000 (VCAA)

The VCAA imposes on VA a duty to provide notice of how to substantiate a claim and to assist in evidentiary development. VA's duty to notify was satisfied by letters in May and July 2008. See 38 U.S.C.A. §§ 5102, 5103, 5103A (West 2014); 38 C.F.R. § 3.159 (2015); see also Scott v. McDonald, 789 F.3d 1375 (Fed. Cir. 2015). 

As to the duty to assist, the Veteran service records and VA treatment records are on file. Also, private clinical records have been obtained. 

On file are reports of VA examinations as to the claimed disabilities. See McLendon v. Nicholson, 20 Vet. App. 79 (2006); Wells v. Principi, 326 F.3d 1381 (Fed. Cir. 2003); 38 U.S.C.A. § 5103A(d)(2); 38 C.F.R. § 3.159(c)(4)(i). 

The Board is entitled to assume the competence of a VA examiner and the adequacy of a VA medical examiner's opinion unless either is challenged. See Sickels v. Shinseki, 643 F.3d 1362, 1366 (Fed. Cir. 2011); Bastien v. Shinseki, 599 F.3d 1301, 1307 (Fed.Cir. 2010); Rizzo v. Shinseki, 580 F.3d 1288, 1290-91 (Fed. Cir. 2009); and Cox v. Nicholson, 20 Vet. App. 563, 569 (2007); and Hilkert v. West, 12 Vet. App. 145, 151 (1999). 

As to this, in his February 2017 statement the Veteran challenged the report results of the VA 2010 CFS examination. However, he was afforded another such examination more recently, in 2016, which also yielded an unfavorable medical opinion. As to this, while the Veteran has reported that he has been educated by his physicians as to CFS, the fact remains that he lacks the education, training, and expertise to render a competent medical opinion as to the existence or etiology of any chronic disorder manifested by fatigue, including CFS, and his February 2017 statement is no substitute for competent medical evidence. Also in that statement he contested the findings of prior VA examiners that he did not have the flu-like onset of CFS, citing to a 1991 STR that he had diarrhea. However, that STR specifically found that the Veteran had viral gastroenteritis and he would now implicitly have the Board conclude that the inservice diagnosis of viral gastroenteritis was incorrect. Also, while it is possible that diarrhea may sometimes accompany not only viral gastroenteritis but also a "flu," the Veteran offers nothing which demonstrates that mere diarrhea from viral gastroenteritis is proof of a "flu-like" onset of CFS. 

Because in this case the rationale set forth in the 2016 VA examination report for the conclusions was based on the most accurate characterization of the evidence of record, including considering prior diagnoses of CFS, this negative medical opinion is entitled to substantial probative weight. See Nieves-Rodriguez v. Peake, 22 Vet. App. 295, 304 (2008) (most of the probative value of a medical opinion comes from its reasoning).

Otherwise, the VA examination reports are accepted as adequate because they collectively provide evidentiary information that speaks directly to the Veteran's subjective complaints, the objective findings found on evaluation, and a medical opinion. 38 C.F.R. § 3.326 (2016). And this was in substantial compliance with the Board's 2016 remand. Substantial, rather than absolute or strict, remand compliance is the appropriate standard for determining remand compliance under Stegall v. West, 11 Vet. App. 268 (1998); see also D'Aries v. Peake, 22 Vet. App. 97, 105 (2008) (citing Dyment v. West, 13 Vet. App. 141, 146-47 (1999)). In this regard, the 2016 VA audiology evaluation did not include an opinion as to the etiology of a current hearing loss, as requested in the 2015 Board remand. However, there is no prejudice resulting from this inasmuch as that examination, as well as the prior 2009 VA audiology examination, demonstrate that the Veteran does not have a hearing loss in either ear by VA standards. 

38 C.F.R. § 3.103(c)(2) requires that a presiding VLJ fully explain the issues and suggest the submission of evidence that may have been overlooked. See Bryant v. Shinseki, 23 Vet. App. 488 (2010). The hearing in this case focused on the elements necessary for claim substantiation and the Veteran, via testimony, demonstrated actual knowledge of the elements necessary for claim substantiation. Neither the Veteran nor his representative have alleged that there was any deficiency with respect to the hearing in this case, much less any violation of the duties set forth in 38 C.F.R. § 3.103(c)(2). While assistance is required, 38 C.F.R. § 3.103(c)(2) does not require that one presiding at a hearing preadjudicate the claim. Bryant v. Shinseki, 23 Vet. App. 488, 496 (2010) (per curiam). 

Moreover, following the hearing the Board remanded the case to help substantiate the claim. Even if not all elements required for claim substantiation are explicitly set forth at a hearing, if those matters are developed by VA, there is no indication of any outstanding additional evidence or information, and particularly if any VA examination was conducted to address such matter, the purpose of 38 C.F.R. § 3.103(c)(2) if fulfilled. See Bryant v. Shinseki, 23 Vet. App. 488, 498-99 (2010). Thus, the Board finds that, consistent with Bryant, Id., the VLJ complied with the duties set forth in 38 C.F.R. § 3.103(c)(2) and that the Board can adjudicate the claim based on the current record. Such is the case here. 

As there is neither an indication that the Veteran was unaware of what was needed for claim substantiation nor any indication of the existence of additional evidence for claim substantiation, the Board concludes that there has been full VCAA compliance. Newhouse v. Nicholson, 497 F.3d 1298, 1302 (Fed.Cir. 2007) ("There is a presumption that [VA] considered all of the evidence of record," and the mere failure by the board to discuss a particular piece of evidence is insufficient to rebut that presumption).

The Board is not required "to assume the impossible task of inventing and rejecting every conceivable argument in order to produce a valid decision." Robinson v. Peake, 21 Vet. App. 545, 553 (2008)), aff'd sub nom. Robinson v. Shinseki, 557 F.3d 1355 (Fed. Cir. 2009). 


Principles of Service Connection

Service connection will be granted if the evidence demonstrates that a current disability resulted from an injury or disease incurred in or aggravated by active military service. 38 U.S.C.A. §§ 1110, 1131 (West 2002); 38 C.F.R. § 3.303. Establishing service connection generally requires (1) medical evidence of a current disability; (2) medical or, in certain circumstances, lay evidence of in-service incurrence or aggravation of a disease or injury; and (3) medical evidence of a nexus between the claimed in-service disease or injury and the present disability. Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004). Service connection may also be granted for a disease first diagnosed after discharge when all of the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d). 

Under 38 C.F.R. § 3.303(b), an alternative method of establishing the second and third elements for service connection is through a demonstration of continuity of symptomatology. Barr v. Nicholson, 21 Vet. App. 303 (2007); see Savage v. Gober, 10 Vet. App. 488, 495-97 (1997); see also Clyburn v. West, 12 Vet. App. 296, 302 (1999). Continuity of symptomatology may be established if a claimant can demonstrate (1) that a condition was "noted" during service; (2) evidence of post-service continuity of the same symptomatology; and (3) medical or, in certain circumstances, lay evidence of a nexus between the present disability and the post-service symptomatology. Savage, 10 Vet. App. at 495-96; see Hickson, 12 Vet. App. at 253 (lay evidence of in-service incurrence sufficient in some circumstances for purposes of establishing service connection); 38 C.F.R. § 3.303(b). "Symptoms, not treatment, are the essence of any evidence of continuity of symptomatology." Savage, 10 Vet. App. at 496 (citing Wilson v. Derwinski, 2 Vet. App. 16, 19 (1991). 38 U.S.C.A. § 1154(a) requires that VA give "due consideration" to "all pertinent medical and lay evidence" in evaluating a claim for disability or death benefits. Davidson v. Shinseki, 581 F.3d 1313 (Fed. Cir. 2009). 

"Lay evidence can be competent and sufficient to establish a diagnosis of a condition when (1) a layperson is competent to identify the medical condition, (2) the layperson is reporting a contemporaneous medical diagnosis, or (3) lay testimony describing symptoms at the time supports a later diagnosis by a medical professional." Jandreau v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir. 2007); see also Buchanan v. Nicholson, 451 F.3d 1331, 1337 (Fed. Cir. 2006) ("[T]he Board cannot determine that lay evidence lacks credibility merely because it is unaccompanied by contemporaneous medical evidence"). 

Once evidence is determined to be competent, the Board must determine whether such evidence is also credible. See Layno v. Brown, 6 Vet. App. 465, 469 (1994) (distinguishing between competency ("a legal concept determining whether testimony may be heard and considered") and credibility ("a factual determination going to the probative value of the evidence to be made after the evidence has been admitted"). 

VA is authorized to pay compensation to any Persian Gulf veteran suffering from a "qualifying chronic disability." A "qualifying chronic disability," includes (a) an undiagnosed illness, (b) a medically unexplained chronic multi-symptom illness (such as chronic fatigue syndrome, fibromyalgia, and irritable bowel syndrome) that is defined by a cluster of signs or symptoms, or (c) any diagnosed illness that the Secretary determines, in regulations, warrants a presumption of service connection. 38 U.S.C.A. § 1117(a)(2)(B). 

To obtain service connection for an undiagnosed illness or combination of undiagnosed illnesses, a veteran needs to show (1) that he or she is a Persian Gulf veteran; (2) who exhibits objective indications of chronic disability resulting from an illness or combination of illnesses manifested by one or more signs or symptoms such as those listed in paragraph (b) of 38 C.F.R. § 3.317; (3) that have become manifest either during active military, naval or air service in the Southwest Asia Theater of operations during the Persian Gulf War, or to a degree of 10 percent or more not later than December 31, 2016 and (4) that such symptomatology by history, physical examination, and laboratory tests cannot be attributed to any known clinical diagnosis. 38 U.S.C.A. § 1117; 38 C.F.R. § 3.317(a); 

Manifestations of an undiagnosed illness or multisymptom illness include, but are not limited to, fatigue, headache, muscle pain, neurological signs or symptoms, neuropsychological signs or symptoms, signs or symptoms involving the respiratory system, sleep disturbances, gastrointestinal signs or symptoms, cardiovascular signs or symptoms, or abnormal weight loss. 38 C.F.R. § 3.317(b). 

Under 38 C.F.R. § 4.88a, for VA purposes, the diagnosis of chronic fatigue syndrome requires: (1) new onset of debilitating fatigue severe enough to reduce daily activity to less than 50 percent of the usual level for at least six months; and (2) the exclusion, by history, physical examination, and laboratory tests, of all other clinical conditions that may produce similar symptoms; and (3) six or more of the following:
(i) acute onset of the condition,
(ii) low grade fever,
(iii) nonexudative pharyngitis,
(iv) palpable or tender cervical or axillarylymph nodes,
(v) generalized muscle aches or weakness,
(vi) fatigue lasting 24 hours or longer after exercise,
(vii) headaches (of a type, severity, or pattern that is different from headaches in the pre-morbid state),
(viii) migratory joint pains,
(ix) neuropsychologic symptoms,
(x) sleep disturbance

When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the Secretary shall give the benefit of the doubt to the claimant. 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102; see also Gilbert v. Derwinski, 1 Vet. App. 49, 53 (1990). 

Fatigue and CFS, Including Due to an Undiagnosed Illness

The Veteran had qualifying service in the Southwest Asia Theater of operations during the Persian Gulf War from January 1991 to May 1991. 38 U.S.C.A. § 1117; 38 C.F.R. § 3.317. As such, service connection may be established for objective indications of a qualifying chronic disability that became manifest during active military, naval or air service in the Southwest Asia Theater of operations during the Persian Gulf War, or to a degree of 10 percent or more prior to December 31, 2016. 

The Veteran contends that he has fatigue or CFS as a result of his service in the Persian Gulf. 

On VA psychiatric examination in April 1994 the Veteran complained of having always felt tired for the last three years. It was noted that he had been a section chief for a multiple launch rocket system, although he had not fired his weapon. He had been in Kuwait and Iraq. After a mental status examination the diagnoses were mild dysthymia, stomach pain, and ringing in the ears. It was opined that he had mild symptoms of a depressive illness, possibly related to his physical complaints and pending divorce. There was no diagnosis of CFS. 

On VA psychiatric examination in January 2009 the Veteran's complaints included decreased energy. After a mental status examination the psychiatric diagnosis was major depression. 

On VA examination in May 2010 for fibromyalgia, CFS, and unexplained muscle and joint aches it was noted that a Dr. Toy had rendered a diagnosis of fibromyalgia/chronic fatigue syndrome, and vitamin D deficiency. After a physical examination the examiner reported that there was no rash, edema or lymphadenopathy, tender or otherwise. The Veteran did have two areas of trigger points with typical rice-grain-under-skin feel in the forearm flexors of both upper extremities. Although he complained of severe muscle tenderness on palpation of all muscles examined, no other trigger points or taut bands were found on careful palpation of all extremities. In particular, while the 18 "tender points" important for the diagnosis of fibromyalgia were all tender, so were all the usual control points. There was no joint swelling, and no true stiffness, although the Veteran did report joint pain with movement. He appeared to have full range of motion of all extremities with distraction testing. Of note, the Veteran gave very poor effort, which he attributed to pain on testing of muscles in isolation. He declined completion of range of motion testing due to pain. When reflexes were evaluated using distraction testing, he repeatedly jerked his entire body vigorously a half second after the actual reflex completed. There was no true clonus. 

The examiner opined that while the Veteran had chronic fatigue, he did not have CFS. The rationale was that CFS, as opposed to mere chronic fatigue, is a diagnosis of exclusion. The Center for Disease Control (CDC) definition of CFS was that of clinically evaluated, "UNEXPLAINED," [sic] persistent or relapsing fatigue that is of new or definite onset; is not the result of ongoing exertion; is not alleviated by rest; and results in substantial reduction in previous levels of occupational, educational, social, or personal activities plus four or more of the following symptoms that persist or recur during six or more consecutive months of illness and that do not predate the fatigue: 

Self-reported impairment in short term memory or concentration 
Sore throat 
Tender cervical or axillary nodes 
Muscle pain 
Multi-joint pain without redness or swelling 
Headaches of a new pattern or severity 
Unrefreshing sleep 
Post-exertional malaise lasting =24 hours

The examiner stated that the Veteran clearly had muscle pain, unrefreshing sleep, and multi-joint pain without redness or swelling. However, review of chart and the examination did not substantiate sore throat, tender cervical or axillary nodes, headaches of a new pattern or severity, or post exertional malaise lasting more than 24 hours. He had been holding a job as a budget analyst which would be very difficult with impairments in memory and concentration. Exclusionary criteria for CFS (as opposed to chronic fatigue) included anxiety, depression, sleep disturbances, and use of anti-hypertensives and depression medications, (among others) all of which were issues which the Veteran currently had. 

At the October 2015 travel Board hearing the Veteran testified, in part, that his fatigue began in 1991 while in the Persian Gulf Conflict. Page 9. His symptoms included headaches, fevers, and sore throat. Page 10.

On VA chronic fatigue syndrome Disability Benefits Questionnaire in November 2015 the diagnoses were primary fibromyalgia and CFS. It was reported that during the time from 1990 to 1998, the Veteran had started noticing pain, exhaustion, post-exertional malaise, which culminated in a formal diagnosis of CFS, and now continuing medication was required to control CFS. To the extent possible, other conditions that might produce similar symptoms had been excluded. He had had the acute onset of CFS. Debilitating fatigue had reduced his daily activity level to less than 50 percent of the pre-illness level. 

Signs and symptoms attributable to CFS, as documented in clinical notes, were: 
Debilitating fatigue 
Low grade fever 
Generalized muscle aches or weakness 
Fatigue lasting 24 hours or longer after exercise 
Headache
Migratory joint pain 
Neuropsychologic symptoms
Sleep disturbance

The Veteran had or had had cognitive impairment attributable to CFS in the form of poor attention, inability to concentrate, forgetfulness, and contusion. The symptoms waxed and waned, and were nearly constant. His symptoms of CFS restricted his routine daily activities, as compared to his pre-illness level and resulted in incapacitation of at least 4 but less than 6 weeks. 

On VA psychiatric examination in November 2015 it was recorded that the Veteran had chronic sciatic pain, fibromyalgia, and arthritis. He had nightmares, anxiety, and problems with cognition and memory due to posttraumatic stress disorder (PTSD) and had sadness and suicidal ideation due to depression. He also had symptoms which included anxiety, depression, chronic sleep impairment, impaired memory, and disturbance of mood and motivation. 

On VA chronic fatigue syndrome Disability Benefits Questionnaire in July 2016 the Veteran's electronic records were reviewed. The examiner stated that the Veteran had not been diagnosed as having CFS. The Veteran reported onset of fatigue during "Dessert Storm". He described the onset of feeling ill with diarrhea while on active duty and reported being evaluated for this condition. He reported, and objective records confirm, poor fragmented sleep related to fibromyalgia and back pain as well as nightmares. He Veteran stated that he always felt unrefreshed and tired when he woke up. The complaints of feeling tired and unrefreshed were noted in the medical records. While a sleep study was ordered by his private provider, the current examiner could not find the results of a sleep study in the VA electronic medical records. The Veteran reported having been diagnosed with a sleep disorder of oxygen desaturation and that he used oxygen to sleep. 

It was reported that the Veteran worked full time as a budget analyst. He stated that this was mainly computer and desk work with no heavy lifting or exertion involved. He reported missing work secondary to fatigue, pain, or both. The examiner stated that continuous medication was not required for control of chronic fatigue syndrome. 

The examiner reported that other clinical conditions that may produce similar symptoms had not been excluded by history, physical examination and/or laboratory tests to the extent possible because the Veteran reported that a sleep study had been completed, and the need for such was indicated in the clinical records, but the results of any sleep study were not in the available records. 

The examiner further stated that the Veteran did not have an acute onset of chronic fatigue syndrome, and did not have debilitating fatigue which had reduced daily activity level to less than 50% of pre-illness level. Further, the Veteran did not now have or ever had any findings, signs and symptoms attributable to CFS. He did not now have or ever had any cognitive impairment attributable to CFS. Then examiner stated that although the Veteran reported fatigue and this is well documented in the medical records, and in fact the Veteran has had previous medical providers render a diagnosis of CFS, the diagnosis of CFS is a disease of exclusion and the Veteran does not meet the exclusionary criteria. 

The examiner further opined that the condition claimed was less likely than not (less than 50% probability) incurred in or caused by the claimed in-service injury, event or illness. The rationale was that while the Veteran had chronic fatigue and this was well documented in his post service medical records, he does not have CFS. CFS is a diagnosis of exclusion and the Veteran has many other contributing conditions to his fatigue. 

The Veteran did not meet the criteria for CFS as his chronic fatigue was not noted to have flu-like onset by review of records nor was it severe enough to reduce or impair his average daily activity below 50% of his pre-illness activity. Specifically, he was still able to work a full time job despite the fatigue. Furthermore, there were other diagnoses contributing to the fatigue, which include sleep dysfunction secondary to depression, pain related to his chronic low back pain and diagnosed fibromyalgia, sleep related breathing disorder reported by the Veteran as oxygen desaturation during sleep (though this is not confirmed objectively in the record), and medications used to treat the chronic conditions of fibromyalgia pain and depression. These factors reduced the quality of the Veteran's sleep which in turn caused him to have daytime sleepiness which was manifesting as fatigue. 

The clinical definition of CFS was that of clinically evaluated, UNEXPLAINED, persistent or relapsing fatigue that is of new or definite onset; is not the result of ongoing exertion; is not alleviated by rest; and results in substantial reduction in previous levels of occupational, educational, social, or personal activities plus four or more of the following symptoms that persist or recur during six or more consecutive months of illness and that do not predate the fatigue: 

1. Self-reported impairment in short term memory or concentration
2. Sore throat
3. Tender cervical or axillary nodes
4. Muscle pain
5. Multijoint pain without redness or swelling
6. Headaches of a new pattern or severity
7. Unrefreshing sleep
8 Post-exertional malaise lasting =24 hours

The Veteran clearly had muscle pain/multijoint pain that has been diagnosed as fibromyalgia. He had intermittently reported multiple symptoms, as noted above. However, we know from peer reviewed medical literature that CFS is often confused with fibromyalgia because of the similar symptoms especially that of fatigue and generalized pain. Most people who meet diagnostic criteria for fibromyalgia also met many of the diagnostic criteria for CFS. However, in CFS muscle pain is less prominent and fatigue is dominant with flu-like onset. Fibromyalgia is the opposite, i.e., pain is dominant. 

Therefore, the current examiner opined that the Veteran's complaint of fatigue as well as his other documented symptomatology of record was consistent with his previously diagnosed fibromyalgia and not of CFS because the condition did not have a flu-like onset and there were multiple other exclusionary conditions contributing to the Veteran's complaint of fatigue. Moreover, the current examiner stated that his opinion was congruent with the May 2010 examiner's opinion. 

In VA Form 21-4138, Statement in Support of Claim, in February 2017 the Veteran's wife reported that she had been married to the Veteran for 13 years, during which his level of energy deteriorated, and he now had extreme fatigue, as to which she provided multiple examples. 

In a June 2016 statement from the Veteran's work supervisor it was reported that the Veteran had numerous unplanned days of absence from work due to pain or fatigue, or both; and due to medical appointments. His tiredness, forgetfulness, being easily angered, and his physical and mental issues adversely affected his work performance. 

In a February 2017 statement the Veteran reported that there was a difference between not getting great sleep and being "tired" or "sleepy" verses "extreme exhaustion/fatigue" after activities, and major stress. He knew when, it was just sleepiness and when it was just pure exhaustion/fatigue. He believed that that he was old enough and had had CFS long enough to know the difference, in addition to having had many doctors educate him on the difference. He believed there was an enormous amount of competent medical evidence and competent lay evidence that had a positive balance weighing in his favor, particularly with the favorable resolution of doubt. He contested the findings of prior VA examiners that he did not have the flu-like onset of CFS, citing to a 1991 STR that he had diarrhea. 

Accompanying the February 2017 statement are records of the Oklahoma University Physician Rheumatology Clinic. These include multiple diagnoses, including fibromyalgia and CFS. 


Analysis

The Board concedes that the Veteran served on active duty in the Armed Forces in the Southwest Asia Theater of operations during the Persian Gulf War. Thus, the Veteran is considered to be a Persian Gulf veteran for purposes of this decision. 

Here, a formal diagnosis of CFS has been made by a private clinical source. However, both of the VA examiners in this case found that he did not have CFS. The Board finds that the opinion of the most recent VA examiner provides the most reasoned and articulate bases for the opinion expressed. That VA examiner has indicated that the fatigue and other symptoms which the Veteran now experiences are symptoms of his service-connected fibromyalgia and his service-connected psychiatric disorder, in addition to a nonservice-connected sleep disorder. Indeed, the VA examiner specifically found that the Veteran did not meet the criteria for a diagnosis of chronic fatigue syndrome. See 38 C.F.R. § 4.88a(a). 

To warrant a grant of service connection for CFS there must be more than a mere diagnosis. Rather, that diagnosis must be confirmed. As the recent VA examiner stated, CFS is a diagnosis of exclusion. In reviewing the private clinical records on file it must be observed that there was no attempt to distinguish the symptoms supporting the putative diagnosis of CFS from other disabilities which the Veteran has. 

However, if the record establishes direct service connection for his CFS, service connection may also be granted. The Board has considered the statements of the Veteran and the other lay statements in support of his claim. However, in essence, these only confirm that the Veteran has had fatigue beginning at an unspecified point in time after his active duty in the Persian Gulf. The lay testimony of the Veteran and the lay statements of record do not establish that CFS was incurred during service. Neither the Veteran nor the other laypersons are competent to diagnose a disease. See Jandreau, 492 F.3d. 1377. In this regard, fatigue is a pure subjective symptom and, as such, is not capable of lay observation. To the extent that the Veteran and others have related histories of matters indirectly suggesting that the Veteran has had chronic fatigue, they still are not competent to establish that he had CFS, as opposed to fatigue or other symptoms which have been medical attributable to other clinically demonstrated medical disorders. In other words, lay persons are not competent to attest that a symptom of a medically demonstrated disability are, in actuality, a symptom of or proof of the existence of, yet another medical disorder. 

In sum, the Board is persuaded that the preponderance of the evidence establishes that none of the clinical or lay evidence is probative for the purpose of establishing that chronic fatigue or CFS were present during service. 

Accordingly, the Board finds that the VA medical opinions, and particularly the most recent VA opinion in 2016, are to be given greater probative value than the combined weight of the favorable lay evidence and the private medical opinion of record. Thus, the preponderance of the evidence is against the claim for service connection for chronic fatigue, claimed as due to an undiagnosed illness, and, so, there is no doubt to be found in favor of the Veteran. 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102. 

Bilateral Hearing Loss

For the purposes of applying the laws administered by VA, impaired hearing will be considered to be a disability when the auditory threshold in any of the frequencies 500, 1000, 2000, 3000, 4000 Hertz is 40 decibels or greater; or when the auditory thresholds for at least three of the frequencies 500, 1000, 2000, 3000, or 4000 Hertz are 26 decibels or greater; or when speech recognition scores using the Maryland CNC Test are less than 94 percent. 38 C.F.R. § 3.385. 

On VA audiology examination in January 2009 the Veteran's claim file, including service treatment records (STRs) was reviewed. The Veteran related an inservice but not postservice history of noise exposure. It was noted that after military service the Veteran had taken a variety of medications, some of which could cause tinnitus (for which service connection is in effect) as well as hearing loss. 

Audiometric testing revealed the Veteran's hearing acuity, in decibels, at certain frequencies was as shown below:

Hertz
500
1,000
2,000
3,000
4,000
Right Ear
20
20
20
15
15
Left Ear
20
20
25
25
35

Speech recognition scores were 94 percent in the right ear and 86 percent in the left ear. 

The examiner stated that the Veteran displayed some test behaviors associated with exaggerated hearing loss. The examiner could not rule out the possibility that organic thresholds were better than reported or that word recognition scores were accurate. The examiner opined that given the benefit of doubt, the test results were acceptable for rating purposes. 

The diagnoses were that hearing acuity in the right ear was within normal limits and that there were no findings suggesting noise-induced hearing loss. There was a mild high frequency loss in the left ear from 4,000 to 8,000 Hz but it was more likely than not that the left ear hearing impairment was acquired after separation from military service. The left ear thresholds were poorer than reported in 1991, 1993, and 1995. The etiology was unknown. 

As to tinnitus, the examiner stated that the history and medical records suggested a correlation between tinnitus and the medications which the Veteran started using on active duty. Specifically, the Veteran reported that the onset of his constant tinnitus was when he was sick and taking a lot of medications during service in May1991. He reported that prior to that he had had what was normal physiological, temporary, tinnitus following acoustic events. The current tinnitus as likely as not arose from the onset of postservice hearing impairment and medications, some of which might have been for service-related problems. If this was the case then there was a possibility that changing the medications could resolve the symptom. Regardless of the exact etiology, there was no doubt that a constant tinnitus was reported as acquired during deployment by the Veteran during his discharge medical examinations in May 1991, as shown by evidence of record. 

In sum, hearing acuity in the right ear was clinically normal but there was sensorineural hearing loss in the left ear. As to tinnitus, while the current complaint of tinnitus might be a symptom of the hearing impairment acquired after discharge from service, there was a strong possibility that the tinnitus might be an adverse reaction to medications. The medical records suggested that during and since Desert Storm the Veteran had been on one or more medications (and sometimes 3 concurrently) with tinnitus as an adverse reaction. 

The 2009 VA examiner indicated that the following medications could be implicated in hearing loss: Salsalate, Tramadol, Naproxen, and Paroxetine. 

At the travel Board in October 2015 the Veteran testified, in part, that he was exposed to acoustic trauma during his service overseas in the Persian Gulf Conflict. Pages 4 and 5. He had submitted statements from friends, co-workers, and family attesting to his continuously having had hearing loss since military service. He was willing to report for another VA examination, if needed. Page 7. 

A report from an audiologist of the University of Oklahoma Health Sciences Center in November 2015 includes a record of audiometric testing in graph form. 

Puretone audiometric testing revealed the Veteran's hearing acuity, in decibels, at certain frequencies was as shown below:

Hertz
500
1,000
2,000
3,000
4,000
Right Ear
30
30
20
25
30
Left Ear
25
35
25
35
50

It was state that the Veteran related a history of exposure to hazardous noise during service from heavy artillery, firearms, and machinery. The hearing protection offered at that time was inadequate. Since service he had been employed as a dispatcher for 19 years, and as a budget analyst for the past 6 years, and was not exposed to noise when so employed and he did not participate in recreational activities that were noisy. It was reported that pure tone audiometry revealed normal hearing, sloping to a mild sensorineural hearing loss in the right ear, and normal hearing sloping to a moderate sensorineural hearing loss in the left ear. Word recognition scores, using the Maryland CNC Word Lists, at 65 decibels and 85 decibels were 88 percent or less in each ear. The diagnoses were tinnitus and a binaural hearing loss. 

The audiologist stated that given the history related by the Veteran it could not be ruled out that his past history of acoustic trauma and exposure to hazardous noise during service were contributing factors to his current hearing threshold levels. 

On VA audiology examination in June 2016 the Veteran's electronic records were reviewed. The examiner specifically stated that the STR audiometric evaluations dated April 25, 1985, May 6, 1990, April 21, 1991, May 16, 1991, June 6, 1993, and January 8, 1995 were all consistent with hearing sensitivity within normal limits from 500 through 4000 Hz, bilaterally. 

Puretone audiometric testing revealed the Veteran's hearing acuity, in decibels, at certain frequencies was as shown below:

Hertz
500
1,000
2,000
3,000
4,000
Right Ear
20
20
15
20
20
Left Ear
20
25
20
25
35

Speech discrimination was 96 percent in each ear. The examiner stated that the Veteran had a sensorineural hearing loss in each ear. 

With respect to the Veteran's right ear and whether a hearing loss was at least as likely as not (50% probability or greater) caused by or a result of an event in military service, the examiner answered in the negative. The rationale was that the Veteran currently had hearing sensitivity within normal limits for rating purposes for the right ear. 

As to whether in the Veteran's left ear there was a permanent positive threshold shift (worse than reference threshold) greater than normal measurement variability at any frequency between 500 and 6000 Hz for the left ear, the examiner stated that there was. However, whether a hearing loss was at least as likely as not (50% probability or greater) caused by or a result of an event in military service, the examiner answered in the negative. The rationale was that the Veteran currently had hearing sensitivity within normal limits for rating purposes for the left ear. 

The examiner specifically noted that the Veteran was service-connected for tinnitus, and recorded the Veteran's complaints as to his hearing loss and his tinnitus. The Veteran denied a history of otalgia, otorrhea, previous otologic surgery, use of amplification devices, and middle ear disorder. He also denied a history of head/ear trauma, and a family history of hearing loss. He reported the onset of tinnitus to be in February to April of 1991. The Veteran reported his inservice history of noise exposure, including during service in Southwest Asia. He denied postservice occupational and recreational noise exposure. 


Analysis

In Hensley v. Brown, 5 Vet. App. 155, 159 (1993) the Court stated that: 

[Applicable VA regulations do] not preclude service connection for a current hearing disability where hearing was within normal limits on audiometric testing at separation from service. . . . Therefore, when audiometric test results at a veteran's separation from service do not meet the regulatory requirements for establishing a "disability" at that time, he or she may nevertheless establish service connection for a current hearing disability by submitting evidence that the current disability is causally related to service. 

Id. at 159-60. 

The holding in Hensley was that VA may not use audiometric tests from a claimant's separation examination as a per se legal bar on proving service connection. In Hensley, inservice audiometric testing yielded elevated thresholds at some frequencies and, so, the Court found that even if audiometric testing at service separation did not met the requirements of 38 C.F.R. § 3.385 (establishing hearing loss by VA standards) the service connection claim could not be denied solely on that basis. Rather, if there were any current hearing loss (by VA standards) it had to be determined whether shifts in auditory thresholds during service represented the onset of any current hearing loss (even if first diagnosed a number of years after service). 

However, the holding in Hensley, Id., places no limitation on the results of inservice audiometric tests being used by medical examiners to reach an opinion, even a negative opinion, and does not hold that VA must disregard an otherwise adequate medical opinion (even if a postservice examiner found audiometric results etiologically relevant). See Gruen v. Shinseki, No. 09-3603, slip op. (U.S. Vet. App. May 16, 2011) (nonprecedential unpublished memorandum decision); Slip Copy, 2011 WL 1837395 (Table) (Vet.App.) (noting that the Board had conceded inservice exposure to acoustic trauma and the claimant currently had a hearing loss by VA standards). More to the point, while a private audiology evaluation yielded findings on audiometric testing of a bilateral hearing loss, VA audiometric tests both before and after that private evaluation found that the Veteran did not have a hearing loss in either ear by VA standards. Thus, the holding in Hensley, Id., is inapposite. 

The American Medical Association defines 'acoustic trauma' as '[a] severe injury to the ear caused by a short-duration sound of extremely high intensity such as an explosion or gunfire.' American Medical Association Complete Medical Encyclopedia 112 (Jerrold B. Leiken, M.D., & Martin S. Lipsky, M.D., eds., 2003). An acoustic trauma can cause permanent hearing loss, but does not necessarily do so. Id." Reeves v. Shinseki, No. 2011-7085, slip op. at 10, footnote 7 (June 14, 2012 Fed. Cir.) (not selected for publication); 2012 WL 2105624 (C.A. Fed.). 

Even assuming, and conceding, that the Veteran was exposed to acoustic trauma during service, this is not the same as having sustained the type of injury that causes both chronic hearing loss and his claimed tinnitus, and having resulting chronic disability. In other words, even if he was exposed to acoustic trauma during service, this does not automatically mean there were chronic residuals, including a hearing loss by VA standards, which was caused thereby. The Veteran and his representative have not pointed to any such statutory or regulatory presumption to this effect, and the Board is aware of none. Thus, while not disagreeing that the Veteran sustained acoustic trauma under the circumstances which he has related, the Board rejects the supposition that the existence of a current hearing loss in either or both ears must be conceded as being due to in-service acoustic trauma. 

Because the 2016 VA examiner reviewed the record, reported the Veteran's history, and related a concise rationale for the opinion expressed at that time, the Board gives greater probative value to the 2016 VA examiner's conclusion that the Veteran does not have a hearing loss in either ear by VA standards. The 2016 examination report and opinion are consistent with the earlier VA examination and opinion in 2009. 

Therefore, the Veteran's statements regarding alleged continuity of symptomatology are inconsistent with the absence of a current hearing loss by VA standards, or even a hearing loss which does not meet VA standards due to being solely sensorineural in nature with lessened acuity in frequencies above 4,000 Hz.

As to the second and third circumstances, delineated in Jandreau, Id., when lay evidence may establish a diagnosis, the Veteran has not reported or stated that he was given a diagnosis during service of any hearing loss, or a diagnosis within one year of service discharge from the last period of active duty in June 1991 of a sensorineural hearing loss (the 2nd circumstance under Jandreau). To the extent that there is lay evidence, from himself or others, that he had hearing difficulties even during military service, or in the immediate postservice years, this is simply too vague to suggest, much less establish that he was given a formal diagnosis of a hearing loss during service or a sensorineural hearing loss within the first postservice year (the 3rd circumstance under Jandreau). 

If a claimed disability is not shown to have been present any time since VA receives a claim for compensation for that disability, the claim must be denied. See McClain v. Nicholson, 21 Vet. App. 319, 321 (2007); Gilpin v. West, 155 F.3d 1353 (Fed. Cir. 1998); Brammer v. Derwinski, 3 Vet. App. 223, 225 (1992). As the evidence is against a finding that the Veteran has had a hearing loss in either ear at any time since he filed his claim, the appeal as to this issue must be denied. 

The Veteran may believe that he now has chronic bilateral hearing loss. As to this, a layperson may speak as to etiology in some limited circumstances in which nexus is obvious merely through lay observation. See Jandreau, Id. Here, however, the question of causation extends beyond an immediately observable cause-and-effect relationship and, as such, the Veteran being untrained and uneducated in medicine is not competent to address etiology in the present case. See Woehlaert v. Nicholson, 21 Vet. App. 456 (2007). In fact, the complexity of diagnosing the nature and etiology of any claimed bilateral hearing loss is shown by the absence of contemporaneous clinical or lay evidence until years after service. In fact, so complex is it that a medical opinion had to be obtained. Unfortunately, the most probative medical opinions are negative and do not support the claim. Rather, they are probative evidence against the claim for service connection for bilateral hearing loss. 

The Veteran is service-connected for tinnitus. With respect to whether tinnitus is a symptom of hearing loss, for the purpose of establishing continuity of symptomatology, in Monzingo v. Shinseki, No. 10-922, slip op. at 9 (U.S. Vet.App. Nov. 21, 2012) it was noted that VA recognized tinnitus and hearing loss were separate and distinct disabilities and that in that case the appellant had not identified any competent evidence of record supporting the assertion that tinnitus is evidence of hearing loss. See 38 C.F.R. § 4.85 and 38 C.F.R. § 4.87, Diagnostic Code 6260.

If a veteran is service-connected for hearing loss, then in a claim for service connection for tinnitus, VA must "consider a theory of secondary service connection for tinnitus based on the appellant's service[-]connected bilateral hearing loss" because VA is required to consider all theories of entitlement. Fountain v. McDonald, 27 Vet. App. 258, (2015). Here, however, the Veteran's is not service-connected for hearing loss in either ear but, rather, for tinnitus. The Court's holding in Fountain, 27 Vet. App. 258 is applicable when a veteran is service-connected for hearing loss and is claiming service connection for tinnitus, but here the circumstances are the opposite, i.e., the Veteran is service-connected for tinnitus and is claiming service connection for hearing loss. Thus, the holding in Fountain, Id., is inapposite. 

Thus, the Board finds that the record as a whole and the opinion of the VA examiners outweigh, for the reasons explained, the credibility of the Veteran's assertion of putative continuity of symptomatology of hearing loss and the findings of a private audiology evaluation. As to this, the Board must consider only independent medical evidence to support the findings rather than provide a medical judgment in the guise of a Board opinion. Colvin v. Derwinski, 1 Vet. App. 171, 172 (1991).

Accordingly, service connection for bilateral hearing loss is not warranted. Since, for these reasons, the preponderance of the evidence is against the claim, the benefit-of-the-doubt doctrine does not apply. See 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102; Gilbert v. Derwinski, 1 Vet. App. 49 (1990).


ORDER

Service connection for a disability manifested by fatigue, including CFS and to include as due to an undiagnosed illness, is denied. 

Service connection for bilateral hearing loss is denied. 



____________________________________________
DEBORAH W. SINGLETON
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs